# United States District Court

____MIDDLE____ DISTRICT OF ____ALABAMA____

RECEIVED
2007 MAR 16  P 2:30

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

The inside of the interior wall located between the floor and the central air conditioning/heating air intake unit at 3226 Brookwood Drive, Montgomery, Alabama

**APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT**

CASE NUMBER: 2:07mj31-CSC

I ____Thomas Halasz____ being duly sworn depose and say:

I am a(n) __Special Agent with the Drug Enforcement Administration__ and have reason to believe
         Official Title

that ☐ on the person of or ☒ on the property or premises known as (name, description and/or location)

   Inside the interior wall located between the floor and the central air conditioning/heating air intake unit at
   3226 Brookwood Drive, Montgomery, Alabama

in the ____Middle____ District of ____Alabama____

there is now concealed a certain person or property, namely (describe the person or property to be seized)

   United States Currency

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)
   contraband, the fruits of a crime, evidence of the commission of a crime, or things otherwise criminally possessed,
concerning a violation of Title __21__ United States Code, Section(s) __841(a)(1) and 846; Title 18 USC 1001 and 2232; Title 26 USC 7201.__
The facts to support a finding of Probable Cause are as follows:

   See Attached Affidavit hereby incorporated by reference as if fully restated herein.

Continued on the attached sheet and made a part hereof.    ☒ Yes  ☐ No

_____
Signature of Affiant

Sworn to before me, and subscribed in my presence

__March 9, 2007__                                    at  __Montgomery, Alabama__
Date                                                     City and State

__Charles S. Coody, Chief United States Magistrate Judge__   _____
Name and Title of Judicial Officer                            Signature of Judicial Officer

# AFFIDAVIT

RECEIVED
2007 MAR 16 P 2:30

1. I, Thomas Halasz, make the following statement under penalty of perjury. I am a Special Agent with the U.S. Drug Enforcement Administration and have been so employed for approximately the last 20 years. I have been employed in law enforcement for approximately the last 28 years. During my tenure with the Drug Enforcement Administration, I was stationed in Miami, Florida from 1987-1998. From 1991-1994, I was assigned to an enforcement group that exclusively investigated large scale money launderers. Information contained in this affidavit is based on my personal knowledge, information received from other law enforcement officers, trial transcripts, interviews and other documents related to the federal prosecution of Leon Carmichael and Freddie Williams.

2. On November 17, 2003, federal and state law enforcement officers seized approximately 574 pounds of marijuana from Freddie Williams' residence in Montgomery, Alabama. Subsequently, Freddie Williams and Leon Carmichael were indicted in the Middle District of Alabama on federal drug and money laundering charges.

3. On June 17, 2005, a federal petit jury convicted Leon Carmichael of Conspiracy to Distribute Marijuana and Money Laundering. Freddie Williams was convicted of Conspiracy to Distribute Marijuana. The jury held both Defendants criminally responsible for 7,000 pounds of marijuana. Both Williams and Carmichael were detained on June 17, 2005 and have been continuously in the custody of the US Marshal to the present time. Prior to trial, both were released on bond.

4. During the trial of Leon Carmichael, Sherry Pettis testified that Carmichael had buried money in the ground. She further testified that Carmichael dug up $1 million dollars on one occasion and $1.2 million dollars on another occasion. Pettis further stated that the $1.2 million stunk or had an odor to it. According to Pettis, Carmichael told her that the money smelled because he buried it near a sewage line that leaked. The sewage had leaked through the bags and onto the money that Carmichael buried. Sherry Pettis put some of this money that smelled bad into a Compass Bank account that she opened in her name for Carmichael. The information about this smelly money was corroborated by two bank tellers from Compass Bank that remembered Pettis coming into the bank and depositing large sums of cash that smelled bad. This information was further corroborated through Compass bank records showing many deposits of large sums of cash into the account. While Sherry Pettis pled guilty to perjuring herself regarding certain portions of her testimony, the portion regarding the bank accounts was not part of her perjury charge and has been, in fact, corroborated by the tellers' testimony and bank records.

5. On March 7th and 8th of 2007, this affiant interviewed Freddie Williams at the Augauga County Jail. Williams said that, shortly after their arrest, Carmichael provided him with $25,000 in cash for Williams to use as legal fees and Carmichael suggested he

1

obtain Barry Teague for a lawyer. Williams did so. Records indicate that Barry Teague entered an appearance for Williams on December 11, 2003.

6. Williams further said that he was later asked by Carmichael to accompany Carmichael to his residence at 3226 Brookwood Drive, Montgomery, Alabama. Once at the residence, Carmichael brought Williams to a location in the house and explained that there was money concealed in a wall which Carmichael believed may have gotten wet. Carmichael further told Williams that he wanted Williams to break out the sheetrock and assist in repackaging and concealing the money. Williams did so and observed stacks of one hundred dollar bills. Williams estimated that the currency filled an area of approximately six square feet and was stacked approximately 18 inches high. Williams also observed that the currency was covered with dust "as if it had been sealed in the wall for years." Williams also noted that some of the currency was slightly damp.

7. Williams further said that Carmichael spent several hours counting the currency. Carmichael then placed the currency in numerous clear plastic bags. Williams recalled that Carmichael said he had four million dollars. Carmichael then placed all of the currency back in the wall. Williams then sheet-rocked the portion of the wall that had been broken out, which resulted in the currency being sealed within the wall. Williams added that he has been employed as a sheet-rocker for years and had worked for Carmichael doing sheetrock work prior to this occasion. Williams said that he has not assisted Carmichael in removing any of the money which he assisted in sealing in the wall and as far as he knows the money is still there.

8. Williams said that there were no other persons present in Carmichael's house during this activity. Furthermore, Williams described Carmichael as being very secretive when conducting any criminal activity. Williams believes that only he and Carmichael know of the existence and the location of the currency in the wall. Williams further stated that Carmichael trusted him because Williams had known Carmichael for 40 years and Carmichael knew Williams would never steal from him.

9. Williams specifically described the location where he sealed up the currency in the wall. Williams said that the currency was concealed at floor level in an interior wall directly below the central heat/air conditioning air intake unit. He further gave explicit instructions explaining how to get to the location from the front door of the house.

10. Williams could not remember specifically when this incident took place. However, Williams did remember that it occurred after he hired Barry Teague (December 11, 2003) and before the trial (June 6, 2005). He further said that it was likely summer and very hot. This would mean that the incident described above would have taken place during the summer of 2004.

11. I believe that this money concealed inside the wall to be the proceeds of drug activity. My belief is based on the investigation of Leon Carmichael and trial testimony regarding the amount of marijuana Carmichael was selling. Trial testimony showed that Carmichael owned a trucking company. Carmichael used his tractor-trailer trucks to

2

transport 100-500 pounds of marijuana from El Paso per week. While there was evidence of breaks in this pattern, for example for a period of time after September 11, 2001, the majority of weeks Carmichael transported 100-500 pounds of marijuana into Montgomery.

12.     At trial, Government witness, Patrick Denton testified that he sold at least 19,300 pounds of marijuana for Carmichael over the course of the charged conspiracy. Based on my training, experience and conversations with other law enforcement officers, I know that from 1998 to 2001, marijuana was being sold in El Paso, Texas for approximately $225 to $250 per pound. According to Denton, he was paying Carmichael $700 to $750 per pound. Thus, Carmichael was profiting approximately $475 to $500 per pound of marijuana. If Carmichael was making $500 per pound of marijuana, Carmichael would net $9.65 million dollars (based on the 19,300 pounds Denton sold). Several others at trial testified that they were distributing marijuana for Carmichael as well. This investigation has revealed several other people that were selling marijuana for Carmichael, but who refused to testify. Further, Freddie Williams told your affiant that, from 2001 until the date of the arrest, November 17, 2003, Williams routinely delivered 25 to 50 pounds of marijuana for Carmichael to various locations. Based on the trial transcript and the investigation, Carmichael could easily have accumulated millions of dollars in drug proceeds.

13.     On May 20, 2005, Carmichael filed tax returns for years 2001, 2002, and 2003. These tax returns falsely recorded income from business that Carmichael did not actually own. Carmichael offered these tax returns into evidence during his trial which began on June 6, 2005. The tax returns stated that Carmichael owned businesses that he, in fact, did not own and made money from businesses that he, in fact, did not make. This was done in an effort to legitimize proceeds that Carmichael earned through the sale of illegal narcotics. No where on his tax returns does Carmichael report income consistent with the amount of currency described by Freddie Williams. This would indicate that this currency described by Williams was not the the result of any legitimate business interest that Carmichael had.

14.     During the interview with Williams, he told your affiant that shortly after seeing the money inside the wall at Carmichael's residence, Williams met with his attorney, Barry Teague. Williams said that he informed Teague that he knew where Carmichael had concealed a large amount of money. Williams asked Teague if that information might be useful in helping him with his pending case. According to Williams, Teague was not interested and nothing further happened as it related to the concealed money or plea negotiations.

15.     Williams acknowledged that after his conviction, he met with this affiant several times for the purpose of cooperating with the government. During such interviews, Williams gave little, if any, information to the government and certainly did not provide this information regarding the money. Williams said that Teague told him not to tell the government anything else until he "gets a better bargain." Dan Hamm was appointed as counsel for Williams on August 1, 2006. Hamm recently began telling the government

that his client wanted to cooperate with the government. March 7, 2007 was this affiant's first meeting with Williams since Hamm became his attorney.

16.     During the period of Carmichael's incarceration in US Marshal's custody at the Montgomery City Jail, this affiant has obtained recordings of some of Carmichael's telephone conversations from June 2005 to June 2006. During these conversations, Carmichael was actively attempting to sell real estate and expressed difficulty paying mortgages and attorneys. Additionally, Carmichael spoke often with his wife Valerie Carmichael. Mrs. Carmichael regularly complained that she needed money for their children, living expenses, and a newer vehicle. Additionally, the Carmichaels have discussed divorce and Leon Carmichael has told his wife that she has signed a prenuptial agreement and therefore will only receive child support if they divorce.

17.     On March 8, 2007, surveillance was conducted at 3226 Brookwood Drive Montgomery, Alabama. A vehicle was observed parked in the driveway of the residence which is registered to Multi-Investments, Inc. This corporation has been previously identified during this investigation and trial as being formed and owned by Leon Carmichael.

18.     On March 8, 2007, Alabama Power responded to a subpoena requesting customer information for 3226 Brookwood Drive, Montgomery, Alabama. Alabama Power records indicate that Leon Carmichael is currently the customer at that address.

19.     On June 20, 2005, Carmichael and the United States entered into a forfeiture agreement in which Carmichael agreed to forfeit assets in lieu of drug proceeds. Even though Carmichael agreed to give up the Carmichael Center, a multi-million dollar facility and one million dollars in substitute assets, Carmichael specifically requested to maintain ownership of his residence at 3226 Brookwood, Drive Montgomery, Alabama. As of the present time, the terms of the forfeiture agreement have not been fulfilled by Carmichael in that $700,000 in substitute assets have not been found or otherwise turned over to the Government.

20.     Subsequent to Carmichael conviction, U.S. Probation Officer David Conoly interviewed Carmichael several times in order to prepare the Presentence Report. Part of the Presentence Report contains an analysis of Carmichael's assets in order to aid the Court in determining whether a fine is appropriate as part of his sentence. Carmichael told Conoly that he disclosed all of his assets to Conoly in preparation for the presentence report. However, Carmichael never disclosed the existence of a large sum of cash to U.S.P.O. Conoly.

21.     This affiant feels that thre is probable cause to believe that a large amount of U.S. currency will be found concealed within the wall of 3226 Brookwood Drive, Montgomery, Alabama which constitutes evidence of a crimes, specifically, Title 21, United States Code, Section 841(a)(1) and 846; Title 18, United States Code, Section 1001; Title 26, United States Code, Section 7201; and Title 18, United States Code, Section 2232. This affiant bases this belief on the following:

4

1. Leon Carmichael was convicted of Conspiracy to Distribute Marijuana and Money Laundering.

2. Carmichael had previously stored and concealed illegal proceeds for long periods of time which had become contaminated. Carmichael was concerned about other currency, which had been concealed within the walls of his house for an extended period of time, also being wet and contaminated. As a result, Carmichael accessed this currency and packaged it in plastic to protect it for an extended period of time.

3. The currency was secreted by sheet-rocking it within a wall, indicating that Carmichael intended that this currency was to remain there for an extended period of time.

4. Carmichael was subsequently incarcerated in June 2005, and has been in custody until the present time precluding his access to the currency.

5. Carmichael has expressed financial difficulties while incarcerated. Although Valerie Carmichael still resides in the Carmichael residence, she obviously either does not know the currency exists or has not removed it for her own use or purposes.

6. According to Williams, Carmichael is cautious in conducting his criminal business. This is corroborated by phone recordings indicating Carmichael does not trust anyone with his financial matters.

7. Carmichael failed to disclose any cash on his tax returns filed in 2001, 2002, or 2003.

8. Carmichael failed to disclose to United States Probation Officer David Conoly that he had a large amount of cash secreted.

9. Through my training and experience, I know that narcotics traffickers generate large sums of cash. These large amounts of cash must be secreted and stored until the narcotics trafficker can find a method to introduce these drug proceeds into the legitimate banking system.

Thomas Halasz, Special Agent
U.S. Drug Enforcement Administration

5

Sworn to and subscribed before me this 9th day of March, 2007.

_____
Charles S. Coody
Chief, United States Magistrate Judge